CHICAGO & NORTH WESTERN RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36343. Promulgated April 30, 1931.

*R. N. Van Doren, Esq.,* and *Nelson Trottman, Esq.,* for the petitioner.

*George D. Brabson, Esq.,* for the respondent.

1410

1416

1418

1420

1424

OPINION.

SMITH: (1) The first question presented by this proceeding is whether $8,191,905.37 of the maintenance expenses of the petitioner for 1920 should be disallowed as a deduction from gross income in the determination of tax liability by reason of the fact that in 1921 the petitioner was allowed $8,191,905.37 in the lump-sum settlement of its claim against the United States for undermaintenance during the period of Federal control.

The respondent concedes that this amount would have been a legal deduction from gross income of 1920 had it not been for the allowance in 1921 of a like sum for undermaintenance in the lump-sum settlement of its claim. In his notice of deficiency, upon which this proceeding is based, the respondent stated:

The Unit eliminated the above item [$8,191,905.37] of undermaintenance allowed in the final settlement with the Director General from the 1921 return and included it in the 1920 taxable income on the basis that such undermaintenance was made good in the year 1920, and since you have not been able to disprove this contention, the action of the Unit in Bureau letter of February 23, 1927 is sustained and your contentions and your protest are denied.

The petitioner contends that it is entitled under the statute to deduct from gross income all of its ordinary and necessary expenses paid or incurred during the taxable year in carrying on its trade or business and that the amount deductible is not affected by the lump-sum settlement of its claim in 1921.

The evidence shows that the petitioner, in 1920, had no knowledge that any part of its claim, filed in the fall of 1920, for undermaintenance during the period of Federal control and amounting to $34,-918,823.30, would be allowed. The Director General of Railroads not only declined to recognize any part of the carrier's claim but, on the other hand, asserted that the carrier owed him $1,774,495.04.

It was not until the summer of 1921 that any progress was made in the adjustment of the claim for undermaintenance and in September, 1921, the claim was allowed to the extent of $8,191,905.37. The petitioner, keeping its books of account upon the accrual basis and in accordance with the requirements of the Interstate Commerce Commission and pursuant to certain instructions given to it in 1921, charged off to profit and loss in 1921 all of the balances of accounts with the Director General of Railroads.

The same issue presented by this assignment of error was before the Board in *Terminal Railroad Association of St. Louis*, 17 B. T. A. 1135. We there held:

It may be conceded that whatever payment or allowance was made to the petitioner for undermaintenance does not constitute income to it; it represents no more than a return to it of its original capitial investment. * * * The position of the Commissioner may be simply stated. When the properties were returned on March 1, 1920, they were undermaintained; during the balance of that year over $1,000,000 was expended for maintenance; a part of this represented expenditures made to overcome the undermaintenance of the period of Federal control and to restore the properties to their normal condition and a part represented normal maintenance; to the extent that expenditures were made to overcome the undermaintenance of the period of Federal control and were paid for by the Director General of Railroads, they do not represent an ordinary and necessary expense of its business, incurred and paid by petitioner, which is deductible in computing its net income subject to tax, but rather an expense paid by the Director General. In other words, the payment claimed may have been made in the first instance by the petitioner, but petitioner was later reimbursed for such expense, so that in effect the expenses for maintenance, to the extent of such reimbursement, were not expenses incurred by it. Upon this basis the Commissioner has reduced the amount expended by petitioner during the year 1920 for maintenance by the amount which he asserts was later paid petitioner to recompense it for a part of such expenditure.

We are of the opinion that the Commissioner must prevail in his contention. The statute (sec. 214 [234], Revenue Act of 1918) provides that in computing net income of a taxpayer there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. We do not understand that this would permit the deduction of expenses paid or incurred by the taxpayer for which he is reimbursed. In such a case the expenses are not his, nor are they paid or incurred by him within the meaning of the statute. The taxpayer is allowed the expenses of its business borne by it and is taxed only upon its net income after its expenses have been deducted.

We there held that, inasmuch as the petitioner did not establish before the Board that the undermaintenance during the period of Federal control was not made good by maintenance expenditures during the period March 1 to December 31, 1920, the disallowance of the deduction from gross income of maintenance expenditures made by the Commissioner was correct, and entered our decision accordingly.

The same question was before us in *Norfolk Southern Railroad Co.*, 22 B. T. A. 302, and in *Missouri Pacific Railroad Co.*, 22 B. T. A. 267. In those decisions we reversed the action of the Commissioner in disallowing a portion of the maintenance expenses, but solely upon the ground that the evidence adduced before the Board tended to show that the undermaintenance during the period of Federal control was not made good by maintenance expenditures within the. taxable period. In *Kansas City Southern Railway Co.*, 22 B. T. A. 949, we held that, since the evidence showed that the maintenance expenditures for the period March 1 to December 31, 1920, equated to maintenance expenditures of a 10-month period during the test period were in excess of the maintenance expenditures of the test period by only a portion of the amount received from the Director General in the lump-sum settlement for undermaintenance, only such portion of the maintenance expenditures for 1920 should be disallowed as a deduction from gross income.

The above decisions of the Board are controlling upon the issue here presented. The petitioner is not entitled to deduct from gross income of 1920 maintenance expenditures which served to overcome the undermaintenance of the period of Federal control. Applying the rule to the case in hand which was applied in *Kansas City Southern Railway Co., supra*, we find that the overexpenditures for maintenance during the period March 1, 1920, to December 31, 1920, was only $3,263,523. The action of the respondent in disallowing the deduction from gross income of $8,191,905.37 is therefore sustained to the extent of $3,263,523.

(2) The second question for our consideration is whether the petitioner sustained a loss deductible from gross income in 1920 by reason of the return to it on March 1, 1920, of its railroad properties in a seriously undermaintained condition. The petitioner contends that the amount of this loss is approximately $25,000,000, or, more accurately, the difference between its claim for undermaintenance, filed with the Director General in 1920, of $34,918,823.30 and the $8,191,905.37 allowed in the lump-sum settlement of 1921, or $26,726,917.93.

The provision of law invoked in making this contention in section 234 (a) (4) of the Revenue Act of 1918, which permits a corporate taxpayer to deduct from gross income " Losses sustained during the taxable year and not compensated for by insurance or otherwise." This provision of law was under consideration by the Supreme Court in *United States* v. *White Dental Mfg. Co.*, 274 U. S. 398, in which the Court stated:

The case turns upon the question whether the loss, concededly sustained by the respondent through the seizure of the assets of the German company, in 1918, was so evidenced by a closed transaction within the meaning of the

quoted statute and treasury regulations as to authorize its deduction from gross income of that year. The statute obviously does not contemplate and the regulations (Art. 144) forbid the deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer. * * * But with equal certainty they do contemplate the deduction from gross income of losses, which are fixed by identifiable events, such as sale of property (Art. 141, 144), or caused by its destruction or physical injury (Art. 141, 142, 143) or, in the case of debts, by the occurrence of such events as prevent their collection (Art. 151).

Assuming that the petitioner's properties were undermaintained during the period of Federal control to the extent contended for by the petitioner and that the undermaintenance was not made good in the lump-sum settlement to the amount of $26,726,917.93, what was the "identifiable event" of 1920 that fixed the loss as one sustained in that year? The petitioner contends that it was the return of the properties by the Director General to it in that year. But the fact is that under its contract with the Director General of Railroads of September 10, 1918, it was provided:

Sec. 5. (a) During the period of Federal control the Director General shall, annually, as nearly as practicable, expend and charge to railway operating expenses, either in payments for labor and materials or by payments into funds, such sums for the maintenance, repair, renewal, retirement, and depreciation of the property described in paragraph (a) of Section 2 hereof as may be requisite in order that such property may be returned to the Companies at the end of Federal control in substantially as good repair and in substantially as complete equipment as it was on January 1, 1918: * * *

Clearly, under the contract the petitioner had a right to recover from the United States any valid claim which it might have by reason of undermaintenance of its properties during the period of Federal control. The petitioner knew that it had such a right under its contract and filed its claim with the Director General of Railroads for undermaintenance upon the basis thereof. The Director General never denied liability under the contract. The petitioner's claim was not settled in 1920. It was an outstanding claim at the close of 1920 and remained a live claim until it was finally settled by the closing agreement of 1921. The closing agreement provided in part:

The purpose and effect of this instrument is to evidence complete and final settlement of all demands, of every kind and character, as between the parties hereto growing out of the Federal control of railroads, * * *

If any loss was sustained upon the settlement it was a loss sustained as a result of the settlement in 1921, and not a loss that is allocable to the year 1920. There was no determinable loss until the claim against the United States for undermaintenance was acted upon.

The petitioner has submitted a mass of evidence in support of its claim that it sustained a loss in 1920 as a result of the under-maintenance of its properties during the period of Federal control which was not made good by the lump-sum settlement of 1921. It has argued before the Board the validity of its claim for under-maintenance filed with the Director General of Railroads in 1920. It contends that the Director General of Railroads did not give sufficient weight to its contention for the " inefficiency of labor " during the period of Federal control in the adjustment of its claim. It presses upon the Board the merits of numerous formulae by which it arrived at the amount of its claim for undermaintenance as con-trasted with formulae used by the Director General of Railroads in arriving at the amount of undermaintenance. We are of the opinion that no useful purpose will be served by a discussion of this evidence. It may furthermore be pointed out that the claim for under-maintenance is largely predicated upon the cost of labor and cost of materials during and at the end of the Federal control period and not upon the cost of labor and materials at December 31, 1917. We think that any capital loss deductible from gross income must be predicated upon the fair market value of the lost or destroyed prop-erty on March 1, 1913, or its cost if acquired subsequent to that date. The evidence does not establish such value or cost. We are of the opinion that if any loss was sustained as a result of the lump-sum settlement that loss does not pertain to the year 1920, which is the only year before us with respect to which the respondent has determined a deficiency. The contentions of the petitioner upon this point are not sustained. Cf. *Missouri Pacific Railroad Co.*, 22 B. T. A. 267.

(3) The petitioner predicates error upon the inclusion in taxable income of $16,533,520.55 received by it from the United States under the provisions of section 209 of the Transportation Act of 1920. By the terms of that section, railroad companies which accepted the provisions of the act were guaranteed an operating income for the six-month period following the Federal control period of not less than one-half of the amount named as annual compensation in their contract with the Director General, or, if a noncontract carrier, not less than one-half of the amount estimated by the President as annual compensation under the Federal Control Act. If the car-rier's operating income for the guaranty period exceeded the amount of operating income guaranteed, the carrier was required to remit the excess into the Treasury of the United States.

The petitioner accepted the provisions of the Act. The amount received by it was income from the carrying on of the business and was properly taxed as a part of the petitioner's gross income for

1920, the year in which it was received. *Gulf, Mobile & Northern Railroad Co.*, 22 B. T. A. 233.

(4), (5), and (6) In the audit of petitioner's return for 1920, the respondent disallowed the deduction from gross income of $1,752,471.52 operating expenses, upon the ground that that amount measured a write-up in its books of account for materials and supplies which were charged out to operation and maintenance in 1920.

The facts upon this point are that at the beginning of Federal control the petitioner turned over to the Director General materials and supplies, including fuel, having an inventory value of $10,344,-410.40, which included materials and supplies of a great many different classes. At the end of Federal control the Director General turned back to the petitioner materials and supplies of various classes having an inventory value of $12,096,881.92. The difference between these two amounts is $1,752,471.52. Of this amount $198,-879.98 represented " leased rails and fixtures " and " material in temporary tracks," concededly capital items. Exclusive of these two amounts the increase in the inventory between the beginning and end of Federal control was $1,553,591.54. At the time that the materials and supplies were returned to the petitioner by the Director General certain classes of material were in excess of similar classes at the beginning of Federal control, while other classes of materials and supplies did not contain as many units as existed at the beginning of Federal control. In the final settlement between the petitioner and the Director General on September 15, 1921, it was agreed that neither party should pay the other anything for the shortages or overages.

With respect to this issue the petitioner makes three contentions:

First: That it sustained a loss of $2,236,938, which represented the shortage of the physical units at prices prevailing in 1920, or a loss of $1,541,802 if the shortage in physical units be valued at 1917 prices.

Secondly: That the operating expenses of 1920 deductible from gross income should not be reduced by the inventory adjustment.

Thirdly: That the Commissioner is in error in determining the amount of the increase in the inventory chargeable to operating expenses in 1920.

With respect to the first contention, it is to be noted that the Director General of Railroads, under his contract with petitioner, was obligated to return to it materials and supplies equal in quantity, quality, and relative usefulness to those of the materials and supplies which he received. The Director General of Railroads never denied his liability under this contract. The contractual liability was settled in 1921 and not in 1920. There was no " identifiable event "

which marked the loss in the inventory, assuming that there was one, as a loss occurring in 1920. When the contract was settled in 1921, the petitioner accepted the inventory turned over to it by the Director General in place of that received by the Director General from the petitioner on December 31, 1917. In the absence of any identifiable event to fix any loss as having been sustained in 1920, this contention of the petitioner is not sustained.

The second contention of the petitioner is decided adversely to it on the authority of *Los Angeles & Salt Lake Railroad Co.*, 18 B. T. A. 168.

The third contention relates to the determination of the amount of the increase in the inventory between December 31, 1917, and March 1, 1920, which went into additions and betterments. It is admitted that a percentage of the increase went into additions and betterments. The petitioner contends that the percentage is 11.61. The respondent, on the other hand, has found a figure more favorable to the petitioner, namely, 11.73. The question is to what base the percentage shall be applied in determining the amount which went into additions and betterments. The petitioner, after making extensive investigations, reaches the conclusion that the base should be $2,734,922.66, which represents the increase in the value of materials and supplies other than fuel between December 31, 1917, and February 29, 1920. The respondent, on the other hand, uses as a base the increase in the total inventory, which increase, excluding $198,879.98 for leased rails and fixtures and material in temporary tracks, was $1,553,591.54. The respondent's computation follows:

Amount of materials and supplies applicable to additions and betterments (11.73 per cent of $1,553,591.54) _____ $182,193.63
Leased rails and fixtures _____ 174,490.68
Materials in temporary tracks _____ 24,389.30

Total _____ 381,073.61

The respondent deducts this total of $381,073.61 from $1,752,471.52, the total increase in the book value of the inventory, and arrives at the sum of $1,371,397.91 as representing the increase in the value of materials and supplies which went into operating expenses in 1920 to be excluded from allowable deductions. The petitioner's method is as follows:

Approximate amount of book increase of materials returned by Director General that was applied to additions and betterments (11.61 per cent of $2,734,922.66) _____ $317,524.52
Leased rails and fixtures _____ 174,490.68
Materials in temporary tracks _____ 24,389.30

Total _____ 516,404.50

Deducting this amount from $1,752,471.52 it arrives at $1,236,067.02 as the amount of the operating expenses shown by its books of account which should be disallowed as a deduction from gross income on this point.

It should be stated, however, that this is not all of the petitioner's contention upon this point, since it also claims the right to deduct the amount of the shortage in materials and supplies returned. Counsel for the petitioner states that the net change, if such a deduction is made, is after giving effect to counterbalancing items to increase the amount of deductions by the further sum of (that is additional to $516,404.50) $180,896.03, if respondent is correct in not eliminating the fuel item, and by $51,544.25 if petitioner is correct in its contention that the fuel item should be eliminated.

Materials and supplies, other than fuel, were carried on petitioner's books of account in a separate account from the fuel account. Charges and credits to the account for fuel were handled independently of other supply charges. The fuel account can be checked up independently of the other items of materials and supplies at any time. Although the sum total of materials and supplies other than fuel charged to additions and betterments can be readily obtained, it is a practical impossibility to determine the particular items of materials and supplies, other than fuel, that are so charged.

The petitioner has made detailed studies upon this point and has introduced in evidence its detailed computations. From a careful study of them we are of the opinion that the item "fuel" should be eliminated from the inventory at the beginning and end of Federal control in arriving at the amount of the increase that went into additions and betterments. The item of fuel did not largely enter into additions and betterments. Of the increase of $2,734,922.66 in the book value of materials and supplies, 11.61 per cent, or $317,524.52, went into additions and betterments other than the capital accounts of "leased rails and fixtures" and "materials in temporary tracks." The petitioner's contentions upon this point are sustained and it is held that the operating and maintenance expenses of the petitioner for 1920 should be reduced only by the amount of $1,236,067.02 by reason of the increase in the book value of the inventory between the beginning and end of the Federal control period.

The further contentions of the petitioner that the amount of the increase in the inventory which went into additions and betterments was in excess of $516,404.50 is not supported by the evidence. There were shortages and overages in the different items on the inventory as it was turned back to the petitioner by the Director General. The petitioner admittedly has not evidence from which it can determine how much of any specific item of inventory went into additions and

betterments and how much went into maintenance expenses. Its contention that more than $516,404.50 of the increase went into additions and betterments is not sustained.

(7) This issue relates to the question whether the petitioner realized a profit in 1920 upon the retirement of a portion of its funded debt. The respondent has included in the petitioner's taxable income of 1920, $24,191.95 as taxable profit from this source. The petitioner contends that no part of the difference between the par value of its outstanding bonds and the amount paid to retire them is taxable income. The petitioner's contention upon this point is sustained. *New Orleans, Texas & Mexico Ry. Co.*, 6 B. T. A. 436.

(8) and (9) The question presented by this issue is whether amortized premiums on bonds issued by the petitioner in 1892 and in 1916, and shown upon the petitioner's books of account as accruals of 1920, were taxable income of that year. There is no question but that the premiums were received in the years 1892 and 1916, respectively. The respondent has, however, included in the gross income of 1920, $2,860.80 representing the amortized premiums allocable to 1920 upon the 1892 issue and $10,069.94 as amortized premiums allocable to 1920 upon bonds of the taxpayer issued in 1916.

The item of $2,860.80 did not constitute a part of the petitioner's gross income for 1920. *Old Colony Railroad Co.*, 6 B. T. A. 1025; affd., 26 Fed. (2d) 408.

The question now before us for the first time is whether any part of the premium received by the petitioner upon the issuance of its bonds at a premium in 1916 is taxable income of the year 1920. This case is unlike the *Old Colony Railroad Co.* case in that here the bonds were issued subsequent to March 1, 1913.

The classification of accounts by the Interstate Commerce Commission requires the accrual of the premium to be taken up as income; in other words, a taxpayer keeping its books of account upon the accrual basis is required to spread the premium received over the life of the bond and report as income of each year an aliquot part of the amount received. The regulations of the Commissioner are to the same effect. Article 544, Regulations 45.

We are of the opinion that the petitioner's books of account accurately reflect the accrual of the premium upon the bonds issued in 1916 in the amount of $10,069.94 for 1920. We can not doubt that where a corporate taxpayer sells its bonds or other debt obligations at a price in excess of the amount which it will have to pay at the maturity of the bond or obligation in the redemption thereof derives income from the transaction. The action of borrowing money is incidental to the carrying on of the petitioner's business. If it makes a gain in such transaction there appears to be no pro-

vision of the statute which exempts that gain from income tax. There appears to be only the question as to whether it all should be reported as income in the year of its receipt or should be spread over the life of the bond. Where a taxpayer keeps its books of account on the accrual basis and spreads the income over the life of the bond, ascribing to each year an aliquot part of the income received, we can see no reason why, for income tax purposes, the books of account do not reflect the correct income. Article 212 (b) of the Revenue Act of 1918 provides:

The net income shall be computed upon the basis of the taxpayer's annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * . * *

Section 213 (a) of the Act provides in part:

* * * The amount of all such items [gains, profits, and income] shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period; * * *

In the instant proceeding the respondent makes no contention that the petitioner's books of account for 1920 do not reflect its true net income so far as the item under consideration is concerned. Neither does the petitioner make any such contention. In fact the petitioner in its brief states:

If such premium constitutes income, then, under the logic of the reasoning in *Chicago, Rock Island & Pacific Ry. Co.* v. *Commissioner of Internal Revenue*, 13 B. T. A. 988, we see no escape from the proposition that such premium should be amortized. * * *

We may assume that the petitioner did not return as income for 1916 the full amount of the premiums which it received on bonds issued in that year. The regulations of the Interstate Commerce Commission upon this point have long been in force. Cf. *Commissioner* v. *Old Colony R. R. Co.*, 26 Fed. (2d) 408. If it made its return for 1916 in accordance with its books of account, as we may presume it did, it returned as income in that year only an aliquot part of the premium received. We see no good reason why, for 1920, it should not likewise return as income an aliquot part of the premium received in 1916. The contention of the respondent upon this point is sustained.

(10) This issue is whether the deduction for amortization of discount upon bonds purchased for retirement and retired during 1920

was properly computed. The evidence shows that the interest which would have accrued upon certain issues of the petitioner's bonds in 1920, if the amount outstanding at the beginning of the year was likewise outstanding at the close of the year, was $29,685.84. This is the amount which the petitioner contends is the accrual of discount upon those bonds. The evidence is to the effect, however, that $496,000 par value of these bonds was retired and canceled during the year. In respect of such bonds the respondent has disallowed the deduction of all or a part of the accrual of discount claimed. The bonds were retired at different dates during the taxable year. We think it is not competent for the petitioner to contend that it is entitled to deduct discount upon the bonds after the date of their retirement. The respondent has determined that the amount of deductible discount upon the issues of bonds in question was $21,228.84. The evidence does not convince us that the petitioner is entitled to deduct any greater amount for the accrual of the discount upon such bonds. For lack of evidence showing error on the part of the respondent in making his computation of the deductible discount, the claim of the petitioner for the deduction of an additional amount of $8,457 is not sustained.

(11) The issue raised by this assignment of error is that the petitioner failed to deduct from gross income, and that the respondent failed to allow the deduction from gross income in the computation of the deficiency, the discount which accrued in 1920 on certain bonds issued prior to 1913. The amount of the discount and expense on certain bonds applicable to 1920 which was not allowed as a deduction by the respondent is $8,295.68. This issue is determined in favor of the petitioner, upon the authority of *Chicago, Rock Island & Pacific Railway Co.*, 13 B. T. A. 988; affd., C. C. A., 7th Cir., March 26, 1931.

(12) In 1920, petitioner paid $14,602.50 representing assessments made against it by the Association of Railway Executives as its proportion of the expenses payable by it. The respondent admits in his brief that the facts in this issue are substantially the same as in the case of *Los Angeles & Salt Lake Railroad Co., supra.*, in which we held that such contributions were proper deductions from the petitioner's income. The contention of the petitioner upon this point is sustained.

(13) In 1920, the petitioner paid $7,300 to certain Y. M. C. A.'s and the Travelers' Aid Society. It is admitted by the respondent that upon substantially the same state of facts the Board held in *Terminal Railroad Association of St. Louis, supra,* that such payments are proper deductions as operating expenses. Upon the basis of our decision in that case the contention of the petitioner is sustained. The petitioner alleged in its petition that the amount paid was $7,450.

But the petitioner has proved payments of only $7,300. The deduction of only $7,300 is allowed.

(14) and (15) In 1920, the petitioner charged to profit and loss $317,943.78 representing unrefundable overcharges written off petitioner's books in 1920 and $37,592.17 representing certain checks and vouchers issued in payment of accounts and wages which were never called for or cashed and which were written off to profit and loss at the end of three years. The contentions of the respondent upon these points are sustained. *Chicago, Rock Island & Pacific Railway Co.*, *supra.*

Reviewed by the Board.

*Judgment will be entered under Rule 50.*